UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| Antjuan To'Bias Greene, | ) C/A No. 4:15-392-JMC-TER |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| Officer White, SCDC Transportation Bus Driver; | ) Report and Recommendation |
| Larry Cartledge, Warden of Perry Correctional | ) |
| Institution (PCI); Ted Riley, Warden Tyger River | ) |
| Correctional Institution (TRCI); James Parrish, | ) |
| Major at TRCI; Cathy Duncan, Captain of TRCI; | ) |
| Lt. Webber, Contraband at TRCI; Dr. Lewis, PCI | ) |
| Physician; and Amy Enloe, PCR Nurse | ) |
| Supervisor, each sued individually and/or in their | ) |
| official capacity, | ) |
| | ) |
| Defendants. | ) |

## **PROCEDURAL BACKGROUND**

Plaintiff, a prisoner proceeding *pro se*, filed this action under 42 U.S.C. § 1983[1]

on January 29, 2015, alleging a violation of his constitutional rights. Plaintiff is

currently housed at the Perry Correctional Institution (PCI). On October 14, 2015,

Defendants  filed a motion for summary judgment. As the Plaintiff is proceeding *pro

se*, the court issued an order on or about October 14, 2015, pursuant to Roseboro v.

Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the motion for summary

---

[1]All pretrial proceedings in this case were referred to the undersigned pursuant to the
provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d), DSC. Because this
is a dispositive motion, the report and recommendation is entered for review by the district judge.

judgment procedure and the possible consequences if he failed to respond adequately. Plaintiff filed a response in opposition to the motion, and Defendants filed a reply.

## DISCUSSION

## STANDARD FOR SUMMARY JUDGMENT

The federal court is charged with liberally construing the complaints filed by pro se litigants, to allow them to fully develop potentially meritorious cases. See Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972). The court's function, however, is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, Weller v. Dep't of Social Servs., 901 F.2d 387 (4th Cir. 1990), nor can the court assume the existence of a genuine issue of material fact where none exists. If none can be shown, the motion should be granted. Fed. R. Civ. P. 56(c).

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317.

Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324 (Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves). Rather, the party must present evidence supporting his or her position through

"depositions, answers to interrogatories, and admissions on file, together with . . . affidavits, if any." Id. at 322; see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## ARGUMENT OF PARTIES/ ANALYSIS

The Plaintiff alleges a constitutional violation asserting that he was a passenger on an SCDC bus that was involved in an accident on July 23, 2013, and Defendants failed to provide him with proper medical care. Further, Plaintiff asserts that Defendants performed an unconstitutional strip search of inmates in a group where he could be viewed by other inmates. Plaintiff seeks compensatory and punitive damages and injunctive relief for all medical care or treatment surrounding the accident to be paid for by SCDC or their insurance carrier.

## Defendant White

Plaintiff alleges that on July 25, 2013, he and six to ten other inmates were being transported back from a medical run at Kirkland Correctional Institution where Plaintiff had a scheduled medical visit for x-rays of his right wrist from a prior injury. Plaintiff asserts that while heading back to their assigned institutions of either PCI,

4

Tyger River Correctional Institution (TRCI), or Livesay Correctional Institution, the driver of the SCDC bus, Officer White, ran into the rear end of another vehicle near Enoree as a result of following too closely. Plaintiff alleges that the impact caused injury to his neck. Warden Tim Riley of TRCI arrived at the scene and then a TRCI transportation van came to transport them to TRCI. (Complaint).

Defendants argue that Donnie White, the driver of the bus at the time of the accident, should be dismissed as a party defendant as Plaintiff fails to state a constitutional claim against him. Plaintiff has alleged nothing more than mere negligence on Mr. White's part in the automobile accident.

It is recommended that Plaintiff's allegations against Defendant White be dismissed as Plaintiff himself asserts it was an accident. Negligence, in general, is not actionable under 42 U.S.C. § 1983. See Daniels v. Williams, 474 U.S. 327, 328-36 & n. 3 (1986); Davidson v. Cannon, 474 U.S. 344, 345-48 (1986); Ruefly v. Landon, 825 F.2d 792, 793-94 (4th Cir.1987); and Pink v. Lester, 52 F.3d 73, 78 (4th Cir. 1995) (applying Daniels vs. Williams and Ruefly v. Landon: "The district court properly held that Daniels bars an action under § 1983 for negligent conduct."). Secondly, 42 U.S.C. § 1983 does not impose liability for violations of duties of care arising under state law. DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 200-03 (1989).

**Defendants Cartledge, Parish, and Duncan**

Defendants argue that Defendants Cartledge, Duncan and Parish should be dismissed as Plaintiff fails to set forth any facts to state a claim against them in violation of Rule 8 of the Federal Rules of Civil Procedure.

Plaintiff has named Cartledge, Duncan, and Parish as party defendants in the caption of his complaint but has failed to make any allegations against these Defendants in violation of Rule 8, FRCP.[2] If Plaintiff has named Defendants Cartledge, Duncan, or Parish due to his/her supervisory positions, the claim fails. Defendants cannot be held liable in his/her individual capacity under a theory of supervisory liability because there is no doctrine of respondeat superior in § 1983 claims. See Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir.1994) (setting forth elements necessary to establish supervisory liability under § 1983). As discussed above, Plaintiff has failed to plead facts sufficient to establish that Defendants Cartledge, Duncan or White are liable under a theory of supervisory liability.

---

[2] The complaint must contain sufficient factual assertions, accepted as true, to state a claim that is plausible on its face. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570. Only the complaint's factual allegations, not its legal conclusions, are accepted as true. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

## Medical Indifference

In his complaint, Plaintiff alleges that he and the other inmates were transported to TRCI after the accident instead of receiving immediate medical attention at the scene in violation of policy.[3] After arriving at TRCI, Plaintiff contends it was thirty minutes before seeing the nurses because they were strip-searched first. Plaintiff asserts that the only medical treatment he and the other inmates received at TRCI was having their vital signs taken and asking if they were hurting any where by two nurses. Plaintiff alleges a Nurse Spencer[4] at TRCI took his vitals at which time he informed her that he could not fully rotate his neck to the right side. Plaintiff asserts that she only assured him that he and the other inmates would receive further medical treatment once they reached their destination if they needed it. Plaintiff alleges that he and the other inmates were placed in a holding cell for about an hour before he was transported back to PCI. Plaintiff asserts that he asked Lt. Wilson at PCI to see medical because he wanted to make sure there was nothing wrong. Plaintiff alleges

---

[3] As Plaintiff attempts to assert a claim under § 1983 for an alleged failure by Defendants to follow SCDC policies or rules, the claim fails. "The failure of prison officials to follow their own policies or procedures, standing alone, does not amount to a constitutional violation." Johnson v. S.C. Dep't of Corrections, No. 06–2062, 2007 WL 904826, at *12 (D.S.C. Mar.21, 2007) (*citing* United States v. Caceres, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1978); see also Riccio v. Cnty. of Fairfax, Va., 907 F.2d 1459, 1469 (4th Cir.1990) (if state law grants more procedural rights that the Constitution requires, a state's failure to abide by that law is not a federal due process issue); Keeler v. Pea, 782 F.Supp. 42, 44 (D.S.C.1992) (violations of prison policies which fail to reach the level of a constitutional violation are not actionable under § 1983).

[4] Nurse Spencer is not a named Defendant in this action.

7

that Nurse Burgess[5] instructed his dorm Lieutenant that Plaintiff could not be seen on July 26, 2013, because he did not sign up for medical. Plaintiff asserts he signed up for sick call on Monday, July 29, 2013, so that it was four days after the accident before he was able to be examined by medical at PCI. Plaintiff alleges he has seen an "actual doctor" only twice about his neck. However, Plaintiff asserts that he has been to sick call between ten and twenty times in the last seventeen months, received medication, and "got placed in therapy for my neck injury in May 2014 if I didn't mention the issue to the specialist I go to see about my wrist." (Complaint).

 "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain" prohibited by the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir.2008) (internal quotation marks omitted).

To show a defendant's deliberate indifference to a serious medical need, a prisoner must allege the defendant knew of and disregarded "the risk posed by" that need. Id. "[A]n inadvertent failure to provide adequate medical care" does not satisfy

---

[5]Nurse Burgess is not a named defendant.

the standard, and thus mere negligence in diagnosis or treatment is insufficient to state a constitutional claim. Estelle, 429 U.S. at 105–06, 97 S.Ct. 285. Such indifference can be displayed, however, through the response of prison doctors and other institutional personnel to an inmate's medical needs, including ignoring an inmate's serious condition or delaying medically necessary treatment. Id. "A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir.2010) (vacating and remanding summary dismissal of complaint alleging three-month delay in dental treatment); see Smith v. Smith, 589 F.3d 736, 738–39 (4th Cir.2009) (finding claim of delay in administering prescribed medical treatment stated an Eighth Amendment claim).

To state a claim of denial of medical treatment against non-medical prison personnel, an inmate must show that such officials were personally involved with a denial of treatment, deliberately interfered with prison doctors' treatment, or tacitly authorized or were indifferent to the prison physicians' misconduct. Miltier v. Beorn, 896 F.2d 848 (4th Cir.1990). Prison personnel may rely on the opinion of the medical staff as to the proper course of treatment. Id.

Under these principles, the Plaintiff has not alleged sufficient facts stating any claim actionable under § 1983 regarding his medical treatment against non-medical

personnel. Therefore, it is recommended that any claims of medical indifference as to Defendants White, Cartledge, Riley, Duncan, Parrish, and Lt. Weber be dismissed.

As to Defendants Dr. Lewis and Nurse Enloe, the Defendants have moved for summary judgment attaching their affidavits. Dr. Benjamin Lewis attests that he is employed by the SCDC as a physician assigned to Perry Correctional Institution. (Lewis affidavit, doc. #40-5). Dr. Lewis is a licensed general practitioner and has been practicing medicine for over thirty-one years. Id. Dr. Lewis was not at TRCI on July 25, 2013, and would have had no involvement with the examination of the Plaintiff or other inmates at TRCI on that date.  Id. Amy Enloe attests that she is a nurse practitioner assigned to PCI and was not at TRCI on July 25, 2013, so that she would not have had any involvement with the examination of the Plaintiff or other inmates at TRCI on that date. (Enloe affidavit, doc. #40-6). Lewis and Enloe assert that, based on Plaintiff's medical records, they did not become aware of any complaints relating to the accident until July 29, 2013, when Plaintiff reported to medical. (Lewis affidavit and Enloe affidavit). According to the medical records, Plaintiff was seen in sick call on Monday, July 29, 2013, complaining of neck pain stating he had been in an automobile accident on July 25, 2013, and had been experiencing pain since the accident. Id. Plaintiff was examined by nursing personnel who reported he was alert and oriented, in no apparent distress,  had steady gait, and his posture was within

10

normal limits. (Enloe affidavit). Plaintiff complained of pain to the right side of his neck to the touch, but there was no edema. <u>Id</u>. Plaintiff declined the offer of Ibuprofen. <u>Id</u>. He was instructed to rest, avoid strenuous activity, and to apply warm compresses to help with discomfort. <u>Id</u>. Plaintiff was already taking Ultram and Mobic. <u>Id</u>. Enloe attests that x-rays of the Plaintiff's cervical spine which were normal. <u>Id</u>. Based on his medical records, Plaintiff was next seen on August 23, 2013, stating he was still in pain and was advised his x-rays were normal. <u>Id</u>. The nurse noted that he exhibited no signs or symptoms of discomfort and he had full range of motion to his neck and shoulder. <u>Id</u>. Enloe reviewed the note and she instructed that he continue on his current medications. <u>Id</u>. Plaintiff signed up for sick call but failed to show up for his appointments on August 27 and September 13. <u>Id</u>. Enloe saw Plaintiff on November 18, 2013, when he requested renewal of Ultram and stated that Mobic was not providing pain relief. <u>Id</u>. He complained he had worsening pain while using the Theraband for his wrist.[6] <u>Id</u>. Enloe renewed Plaintiff's prescription for Ultram until he completed using the Theraband on December 12. <u>Id</u>. Enloe next saw Plaintiff on December 13, 2013, and informed Plaintiff she would not renew his prescription for Ultram. <u>Id</u>. However, she did extend the use of the Theraband upon Plaintiff's request stating that it was helping his wrist. <u>Id</u>. Plaintiff was seen on March

---

[6] The wrist pain was from a prior injury.

25, 2014, complaining of neck pain for the first time since December 2013. Id. Enloe reviewed the nurse's note and determined that it would be best to schedule Plaintiff to see Dr. Lewis. Id. Plaintiff saw Dr. Lewis on April 15, 2014, wherein he complained of persistent wrist pain and neck pain upon rotating his head to the right. (Lewis and Enloe affidavits). Dr. Lewis submitted a consult for Plaintiff to be seen in follow-up by the orthopedist who had seem him in relation to his wrist and that x-rays of his wrist were to be completed before the appointment. Id. Dr. Lewis extended the prescription for Ultram until Plaintiff was seen by the orthopedist. Id. Plaintiff saw the orthopedist on May 13, 2014, who recommended that he continue using the Theraband for his wrist and to follow-up for reevaluation in a year. Id. Plaintiff also complained of neck pain and was evaluated by the orthopedist who found no need for additional imaging for his neck pain. Id. Per his medical records, Plaintiff requested increases in the amount of Ultram but noted that it was for his wrist pain. (Enloe affidavit). Plaintiff saw Dr. Lewis on September 16, 2014, complaining of right shoulder pain and ongoing wrist pain. (Lewis and Enloe affidavit). Plaintiff stated he wanted to increase Ultram to twice a day and wanted to see the orthopedic surgeon about possible fusion of his wrist. Id. Dr. Lewis ordered an x-ray of Plaintiff's shoulder due to his complaints and that he be seen by the orthopedist at the next available appointment. Id. Plaintiff was again seen by the orthopaedist on November

24, 2014, for both his wrist and neck/shoulder, who recommended one physical therapy visit for his hand/ wrist and neck/shoulder which was completed that day to instruct him on proper methods of physical therapy. Id. Theraband was ordered for two months. Plaintiff was seen on multiple occasions for complaints relating to his neck, has been prescribed medications, sent for x-rays and seen by a specialist. Id. There have been no definitive diagnosis in relation to his neck. Plaintiff was provided appropriate medical care.[7] Id.

Upon review of the record, Plaintiff fails to present evidence sufficient to create a genuine issue of material fact as to whether Defendants Enloe and Lewis were deliberately indifferent to his serious medical needs. See Sharpe v. South Carolina Dept. Of Corrections, 2015 WL 1500680 (4th Cir. 2015). As alleged by Plaintiff and Defendants, Defendants Lewis and Enloe had no knowledge concerning the accident until July 29.[8] Plaintiff has shown nothing more than a disagreement with the treatment provided, not that he was completely denied treatment by these Defendants. In other words, Plaintiff's allegations are not for deliberate indifference to medical care but merely a disagreement with treatment. Also, there is no suggestion

---

[7] Defendants submitted the affidavit of Warden Riley, Warden of the TRCI, who attests that it is his understanding that all inmates were examined by medical personnel after arriving at TRCI.

[8] Plaintiff alleges that he spoke to different officers about going to medical and that Nurse Burgess informed one of the officers that he could not be seen on July 26, 2013, for failure to sign up for sick call. However, these individuals are not named defendants.

or evidence that Defendants maliciously intended to cause Plaintiff pain. The evidence shows he received treatment, including medication, x-rays, and was seen by an orthopedic specialist. "Although the Constitution does require that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice" Jackson v. Fair, 846 F.2d 811, 817 (1st Cir. 1988). Any disagreement between an inmate and medical personnel generally fails to state a claim.  Accordingly, it is recommended that Defendants' motion for summary judgment be granted with respect to Plaintiff's claims of medical indifference.[9]

**Strip search**

Plaintiff alleges a Fourth Amendment violation when he and the other inmates transported to TRCI following the accident were strip searched. Specifically, Plaintiff alleges that they were being detained in the visitation room at TRCI "[w]hen their officers did finally decided to let us out fo the cuffs they then tood all of us in a room and did a group strip search. All of us standing around watching each other be made to get naked and feeling humiliated in the process while the officers present look on

---

[9] Furthermore, if Plaintiff is attempting to file a medical malpractice claim, it fails. Plaintiff has not complied with the requirements of S.C. Code Ann. 15-79-110 and 15-36-100 for filing medical malpractice claims.  Plaintiff did not file a notice of intent to file suit and did not file an affidavit of an expert witness prior to filing suit.

14

to all because our bus driver hit someone's car." (Complaint at 5).

In support of their motion for summary judgment, Defendants submitted the affidavit of Warden Tim Riley who attests that he is the Warden at the TRCI. (Riley affidavit, doc. # 40-3). On July 25, 2013, he was notified that an SCDC bus carrying inmates had been in an accident and determined that the accident was only about three miles from TRCI. Id. Therefore, Warden Riley proceeded to the scene to provide additional security and ordered that a van be brought from TRCI to pick up the inmates. Id. When he arrived at the scene, Warden Riley observed there was very minimal damage to the bus and the other vehicle. Id. Riley took photographs of the bus and the other vehicle and attached them to his affidavit. Id. Riley ordered that the inmates be transferred from the bus to the van and taken to TRCI. Id. It appeared to be a very minor impact, and Riley did not observe any injuries to any of the inmates or signs of distress. Id. Nonetheless, Riley called the institution to make sure the medical personnel stayed at the prison so they could examine the inmates when they arrived. Id. Based upon his recollection, one or more of the inmates were actually housed at the TRCI, and the remaining inmates were housed at other institutions. Id. Riley instructed that all the inmates be transported to TRCI so that they would be in a secure location and could be examined by medical personnel. Id. Additionally, the accident occurred in July, and Riley did not want the inmates to sit in the van in the

15

heat while they waited for the Highway Patrol to arrive and investigate the accident. Id. After the inmates were examined, transportation was arranged to take the inmates to the institutions where they were housed. Id. Anytime inmates enter a Level II or Level III institution, they are required to be strip-searched for security purposes in order to make sure that they have not obtained weapons or other types of contraband to bring it into the institution. Id. Riley was not present for the searches and did take part but attests that they would have been done in the shakedown room off of the visitation area. Id. In the shakedown room, there are separate cubicles where the inmates would have been searched, but it is possible they could have been observed by other inmates during the search. Id.

Defendants submitted the affidavit of Jason Webber, Lieutenant at the TRCI. (Webber affidavit, doc. #40-4). Webber attests that he was notified that an SCDC bus carrying inmates had been in an accident on July 25, 2013. Id. Warden Riley instructed that a van be taken to the scene of the accident so the inmates on the bus could be brought back to TRCI. Id. Webber then proceeded in the van to pick up the inmates and transport them to TRCI. Id. Webber observed very minimal damage to the bus and the other vehicle upon arriving at the scene. Id. The inmates were transported to TRCI for purposes of having them in a secure location and to get them out of the heat. Id. Webber assisted in placing the inmates in the van to bring them

to TRCI and did not observe any injuries to any of the inmates and none appeared to be in any type of apparent distress. Id. Any time inmates enter a Level II or Level III institution they are required to be strip-searched for security purposes.  Id. The searches of the inmates took place in the shakedown room off of the visitation area where there are four separate cubicles.  Id. The inmates were searched and there would have been a total of four inmates in the room at one time.  Id. The searches were conducted in the cubicles, but it is possible the inmates could have been observed by other inmates during the search.  Id. After the searches were complete, the inmates were examined by the medical personnel.  Id.

Strip searches do not violate a prisoner's Fourth Amendment right to privacy if the search is reasonable. Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The test of reasonableness requires considering "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Id. at 559. Addressing invasion of privacy claims by prisoners, the Fourth Circuit has stated:

> Persons in prison must surrender many rights of privacy
> which most people may claim in their private homes. Much
> of the life in prison is communal, and many prisoners must
> be housed in cells with openings through which they may
> be seen by guards. Most people, however, have a special
> sense of privacy in their genitals, and involuntary exposure
> of them in the presence of people of the other sex may be
> especially   demeaning   and   humiliating.   When   not

> reasonably necessary, that sort of degradation is not to be
> visited upon those confined in our prisons.

Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir.1981); [a]n inmate's Fourth Amendment

"right to privacy [is] not violated by the occasional, inadvertent encounter with female

guards." Thomas v. Shields, 981 F.2d 1252 (4th Cir.1992) (table opinion). "In

determining whether a certain act violated a prisoner's right to privacy, the court must

determine if there was reasonable necessity for the act.... [R]easonable necessity is

intertwined with penological interest: if an inmate's privacy can be maintained without

compromising prison operations, then that privacy should be respected." Cook v.

McCabe, 2013 WL 3552419 (D.S.C. July 11, 2013) *quoting* Pelzer v. McCall, No.

8:10–cv–914–RMG–JDA, 2011 WL 3021193, at *9 (D.S.C. July 22, 2011) (internal

citations omitted). There is a penological interest in security when inmates enter a

Level II or Level III institution. Here, Plaintiff challenges the manner and place in

which the strip search was conducted. Courts should give great deference to decisions

made by officials relating to their administration of a prison facility. Bell, 441 U.S. at

547. Plaintiff alleges that the inmates brought in to TRCI from the bus wreck were

strip searched in a room where they could observe one another. Defendants assert that

the searches were performed in individual cubicles in the shakedown room but that

it may have been possible for other inmates to observe the inmates during the search.

Based on the limited facts disclosed in the record presented, Plaintiff fails to show a

18

constitutional violation. Furthermore, Plaintiff has not shown the personal involvement by particular named defendants in the strip search. Finally, even assuming *arguendo* that a constitutional violation occurred, Defendants are entitled to qualified immunity.


## Qualified Immunity

Defendants deny that any of the alleged conduct or conditions complained of by Plaintiff gives rise to a constitutional violation. However, Defendants assert that, even if this Court concludes that the facts are sufficient to establish a Constitutional claim, they are entitled to qualified immunity.

> The doctrine of qualified immunity attempts to reconcile two potentially conflicting principles: the need to deter government officials from violating an individual's federal civil rights and the need for government officials to act decisively without undue fear of judicial second guessing.

Akers v. Caperton, 998 F.2d 220, 225-26 (4th Cir. 1993).

The Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800 (1982), established the standard which the court is to follow in determining whether Defendant is protected by this immunity.

> Government officials performing discretionary functions generally are shielded from liability for civil damages

> insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Harlow, 457 U.S. at 818.

In a discussion of qualified immunity, the Court of Appeals for the Fourth Circuit stated:

> Qualified immunity shields a governmental official from liability for civil monetary damages if the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." "In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Moreover, "the manner in which this [clearly established] right applies to the actions of the official must also be apparent." As such, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.

Wiley v. Doory, 14 F.3d 993 (4th Cir. 1994) (internal citations omitted), cert. denied, 516 U.S. 824 (1995). As discussed above, the Plaintiff fails to show that Defendants violated any of his clearly established constitutional or statutory rights. However, even if there was a violation, Defendants are entitled to qualified immunity. The record before the court shows that Defendants performed the discretionary functions of their respective official duties in an objectively reasonable fashion. Defendants did not transgress any statutory or constitutional rights of Plaintiff of which they were aware

20

in the exercise of their respective professional judgments. Thus, the undersigned recommends that summary judgment be granted as to these Defendants.

## Eleventh Amendment Immunity

The Defendants contend that the Plaintiff's §1983 claims against them for money damages in their official capacity are barred pursuant to Eleventh Amendment Immunity. Defendants also argue that the action against them should be dismissed as a matter of law to the extent that they are sued in their official capacity because while acting in their official capacity as an employee of the SCDC, they are not a "person" under 42 U.S.C. §1983 and, therefore, not subject to suit.

When a defendant is sued in his or her official capacity, the suit is frequently intended as one against the state, the real party in interest. If review of the pleadings indicates that the state is, in fact, the party being sued, then a judgment awarding damages is precluded by the Eleventh Amendment of the United States Constitution. Although declaratory and/or injunctive relief may be granted, damages may not be awarded against the state.

In the case of Will v. Michigan Department of State Police, 491 U.S. 58 (1989), the Supreme Court analyzed the interplay between § 1983 and the Eleventh Amendment of the Constitution and stated:

21

> Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity (cites omitted) or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity.

The Eleventh Amendment immunity granted to the states "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes," but the court found that state agencies, divisions, departments and officials are entitled to the Eleventh Amendment immunity. Will, supra at 70. In reaching this conclusion, the court held that a suit against state officials acting in their official capacities is actually against the office itself, and therefore, against the state. State officials may only be sued in their individual capacities.

There is no dispute that Defendants were/are employees of the SCDC at the time of the allegations in the complaint. Thus, they are entitled to Eleventh Amendment immunity from monetary damages in their official capacity.

## Pendent Jurisdiction

Assuming Plaintiff's § 1983 claim is dismissed by this Court and Plaintiffs' complaint somehow can be conceived to state an additional claim for relief under any

state common law theory, the undersigned concludes that such claim(s), if any, ought to be dismissed as well for want of jurisdiction. Specifically, this Court can decline to continue the action as to the pendent claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).

## **CONCLUSION**

The Plaintiff has failed to show that Defendants violated any of his constitutional or statutory rights under 42 U.S.C. § 1983. It is therefore, for the reasons stated herein,

RECOMMENDED that the Defendants' motion for summary judgment be GRANTED IN ITS ENTIRETY and the case dismissed.

IT IS FURTHER RECOMMENDED that any outstanding motions be deemed MOOT.

Respectfully submitted,

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

February 29, 2016
Florence, South Carolina

The parties' attention is directed to the important information on the attached notice.